UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Janet Duhy

    v.                         Civil No. 1:08-cv-00192-JL
                                      Opinion No. 2009 DNH 074
Concord General Mutual
Insurance Company

**O R D E R**

The plaintiff, Janet Duhy, brought this action against her former employer, Concord General Mutual Insurance Company, in Grafton County Superior Court, alleging retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2615 ("FMLA"), and employment discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"), and its state law analog, N.H. Rev. Stat. Ann. § 354-A ("RSA").  She also brought a claim under New Hampshire law for wrongful discharge.  Concord General removed the case to this court, see 28 U.S.C. § 1441(b), and moved for summary judgment on all claims.

The court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction). After oral argument, and for the reasons set forth below, the court grants Concord General's motion.

## I.    APPLICABLE LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "An issue is genuine if it may reasonably be resolved in favor of either party at trial, and material if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (internal quotation marks, bracketing, and citation omitted).  In ruling on a motion for summary judgment, the court examines the record evidence in the light most favorable to the nonmovant, indulging all reasonable inferences in that party's favor.  See id.

"The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists."  Id.  But "a measure of factual specificity is required; a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden."  Id. (internal quotation marks omitted).  The nonmovant's evidence "cannot be conjectural or problematic; it must have substance in

the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks and citation omitted).  On the other hand, "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." <u>Coyne v. Taber Partners I</u>, 53 F.3d 454, 460 (1st Cir. 1995).

## II.  <u>BACKGROUND</u>[1]

Concord General hired Duhy in 2003 as a personal lines underwriter.  Duhy's job primarily entailed reviewing insurance coverage applications, submitted by independent insurance agencies on behalf of their clients, "to make sure the business [was] right for [Concord General]."[2]  Because these agencies directed business to Concord General, the position required underwriters like Duhy to maintain a strong working relationship with their insurance agents.  Among Concord General's client

---

[1]Consistent with the summary judgment standard, the court states the facts in the light most favorable to the nonmovant, Duhy.  <u>See</u> <u>Iverson</u>, 452 F.3d at 98.

[2](Duhy Dep. 24).

3

agencies were Eaton & Berube Insurance Agency, Bessey Insurance Agency, and Allied Insurance Agency.

Until the fall of 2005, Duhy's employment at Concord General was generally marked by good health and positive performance reviews from her supervisors.  That fall, however, Duhy missed several workdays because of medical problems, and, at least in the opinions of some of her client agencies, became inattentive and unresponsive to their inquiries.

**A. Leg pain**

Duhy's first health problem at Concord General began, and ended, in the fall of 2005.  In late October, after experiencing a sudden and sharp pain in her left calf, Duhy saw her physician, who detected abnormal reflexes that he conjectured could be caused by multiple sclerosis or Parkinson's disease and referred Duhy to a neurologist.  Shortly thereafter, but before she was seen by the neurologist, Duhy informed her direct supervisor at Concord General, Jennifer McLean,[3] that Duhy "had to schedule an MRI because [she] went to the doctor and he said that my reflexes were abnormal . . . and he was concerned, not to make me worry,

---

[3]It appears that while the facts relevant to the present motion were unfolding, Jennifer McLean changed her name to Jennifer Cassidy.  For clarity's sake, the court will hereinafter refer to her as "McLean."

but it is a sign of MS or Parkinson's."[4]  By the middle of
December, Duhy's neurologist concluded that she had neither of
these serious conditions.  Furthermore, the calf pain soon
relented and Duhy returned to work without restrictions.  Duhy
did not inform anyone at Concord General of the neurologist's
negative findings until January 30, 2006.

**B. Complaints about Duhy's work performance**

Soon after the onset of Duhy's calf pain, several of her
client agencies began to complain about her.  On November 4,
2005, Marc Berube, a principal at Eaton & Berube, called Mike
Nolin, a manager in Concord General's underwriting department, to
complain about Duhy's "lack of timely response/reply/service."[5]
Several days later, Berube reiterated his own concerns, as well
as those of his employees, in a meeting with Al Brack and Tracie
Wilson, two of Concord General's marketing representatives.
According to Brack, "[Berube] advised that his people had
mentioned to him and Marty Thibodeau, the manager, that the
underwriter, Janet Duhy, was very slow to get back to people and
oftentimes [forgot] what they called for.  He asked that he be

---

[4](Duhy Dep. 55).

[5](Def.'s Mot. for Summ. J., Ex. B).

5

assigned a new underwriter . . . ."[6]  Around this same time,
Concord General received similar complaints about Duhy from
employees at Bessey Insurance and Allied Insurance.[7]

In December, McLean spoke directly with employees at Eaton &
Berube and Bessey Insurance about the complaints.  An Eaton &
Berube agent complained to McLean "that it sometimes took weeks
to get a response from [Duhy] and that when an agent called to
follow-up on a prior discussion [Duhy] would not recall the prior
conversation forcing the agent to go through everything again."[8]
Bessey Insurance's employee told McLean that Duhy "was difficult
to reach and that they would have to keep calling her to get a
response."[9]  McLean discussed the negative feedback with Nolin,
but decided to wait until after the holidays to discuss the
matter with Duhy.[10]

---

[6](Def.'s Mot. for Summ. J., Ex. C).

[7](Def.'s Mot. for Summ. J., Ex. D; McLean Aff. ¶¶3 and 8).

[8](McLean Aff. ¶4).

[9](Id.).

[10](See McLean Aff. ¶5).

**C. Shingles**

On Monday, January 9, 2006, Duhy was diagnosed with the "shingles" virus.  The diagnosing nurse practitioner excused Duhy from work through the end of the week.[11]  Duhy relayed this information to McLean, who passed it along to Concord General's human resources department.  That week, the human resources department sent Duhy a notice of her rights under the FMLA, along with a cover letter stating:  "Enclosed please find FMLA paperwork that protects your job while you are out of work.  We were not sure how long you may be out so I thought I would send this along should you need it."[12]  Duhy was advised that, in the event she sought to have her leave protected under the FMLA, her health care provider would need to return a "medical certification form of a serious health condition" by January 26, 2006.[13]  See 29 U.S.C. § 2613(a) (permitting employer to require that a request for leave be supported by health care provider's certification).

---

[11](Def.'s Mot. for Summ. J., Ex. A, p. 4).

[12](Def.'s Mot. for Summ. J., Ex. E, p. 1).

[13](Def.'s Mot. for Summ. J., Ex. E, p. 3).

The following Monday, Duhy called McLean to request an additional week as "vacation just to get back up on my feet."[14] McLean quickly approved this request.[15]  Duhy also presented the medical certification form to her nurse practitioner, who notified Concord General that Duhy's illness did not qualify as a "serious health condition" within the meaning of the FMLA.  See id. § 2611(11).

**D. Concord General's response to agents' complaints**

On January 25, 2006, days after Duhy returned to work from her two-week absence, McLean and Nolin met with her to discuss "her job performance and health related stress issues."[16]  After discussing the "recent feed back from several of [Duhy's] agents indicating a less than favorable response time in her getting back to their service requests," which Duhy conveyed was "related to ongoing health concerns by her doctor and the many tests she has had to undergo as a result," the parties "were able to key in on a few areas where we think [Duhy] will be able to restructure

---

[14](Duhy Dep. 73).

[15]According to Duhy, McLean mistakenly believed she "was out job hunting." (Duhy Dep. 79).

[16](McLean Aff. ¶9).

8

and make effort to change her work habits."[17]  Concord General provided Duhy with guidelines to follow to address these issues, and decided that "at the end of 10-12 weeks, [Duhy, Nolin, and McLean would] meet again."[18]  Several days later, Duhy received and initialed a corresponding plan of action and a memorandum memorializing the substance of the meeting.  Duhy then asked McLean the names of the clients who had complained about her performance.  In a disclosure she would later regret, McLean "mentioned Eaton & Berube, Bessey, and Allied as the primary agents."[19]

On February 3, 2006, McLean spoke with Berube about Duhy.[20] Berube expressed concern over an e-mail Duhy had sent to his staff, the specific contents of which are not before the court. Berube expressed displeasure because "his staff would [now] know that [negative] feedback [had been] given and it could place them in an uncomfortable position when communicating with [Duhy]."[21]

Early the following month, McLean met with Duhy and asked "how her workload was and if some of the items [they] had

---

[17](Def.'s Mot. for Summ. J., Ex. H, p. 1-2).

[18](Def.'s Mot. for Summ. J., Ex. H, p. 3).

[19](McLean Aff. ¶11).

[20](See Def.'s Mot. for Summ. J., Ex. F).

[21](McLean Aff. ¶12).

identified [in the plan of action] were helpful . . . .  Duhy
said things were better and that she was adjusting."[22]  McLean
then reported to Nolin "that things were going well and that it
seemed like we had put [Duhy's] performance issues behind us."[23]
Nevertheless, Concord General decided to assign a new underwriter
to Eaton & Berube, a reassignment that Duhy viewed as a "good
thing" because, she said, Eaton & Berube's agents were "not very
thorough" and "not one of the best agents to have."[24]

**E. Contacts with Eaton & Berube**

On March 17, 2006, Duhy e-mailed an Eaton & Berube agent:

> I was made aware that your agency has a less
> than favorable rapport with me and requested
> a new underwriter.  I was unhappy to hear
> that as I have tried to accommodate the best
> I could throughout the last 3 years while
> your agency has been reunderwriting and on a
> moratorium plan.[25]

The second quoted sentence from the e-mail was, in the context of
the business relationship, somewhere in the range between

---

[22](McLean Aff. ¶13).

[23](Id.).

[24](Duhy Dep. 103-04).

[25](Def.'s Mot. for Summ. J., Ex. K).

passive-aggressive[26] and overtly insulting.  Duhy later
apologized to Berube for having sent this e-mail to one of his
employees.[27]  On April 14, 2006, she sent an e-mail to a
different employee, stating:

> I have to ask you a question as it has been
> bothering me immensely since I was made aware
> that your agency had less than a favorable
> relationship with me . . . .  It was also
> mentioned that I did not make calls back to
> the agency or e-mails within a certain time
> frame.  I was a little disappointed to hear
> that it was enough to request a new
> underwriter . . . .  When I heard that
> [Berube] mentioned that he would no longer
> place insurance with Concord [General] if
> this wasn't addressed, I was horrified to
> think how bad could I have been for someone
> to say that.  Regrettably, I have been
> written up over this and to be honest this is
> the first time in my working career that this
> has happened to me and I have worked for some
> very large agencies.  I just need to know for
> my own personal mental state of mind--was I
> really that dreadful of an underwriter to
> result in this decision?  If you are not
> comfortable answering this I completely
> understand.[28]

Three days later, Duhy again contacted Berube about his
agents' complaints.  Nolin then spoke with Duhy about this

---

[26]Passive-aggressive:  "being marked by, or displaying
behavior characterized by negative feelings, resentment and
aggression in an unassertive way."  Merriam-Webster's Medical
Dictionary (2002).

[27](See Def.'s Mot. for Summ. J., Ex. L).

[28](Def.'s Mot. for Summ. J., Ex. M).

contact, and expressed his concern about her communicating with Eaton & Berube employees about their complaints.  After speaking with Nolin, Duhy contacted Berube via e-mail:

> I just wanted to say thank you for talking with me this AM.  I really didn't want to put you in the middle of things, but there are times in our lives that we have to ask questions when we need assistance.  I did talk private [sic] with Mike Nolin regarding the issue and he will get back to me later.  I do not believe he is very happy with me that I called you as he worries about the company relationship.
>
> I want to apologize for the way you interpreted [the March 17, 2006] e-mail that I sent to [Eaton & Berube].  I never in anyway meant to make you think that Concord [General] does not think of the agency with respect.  That is not true . . . your agency is respected here at Concord [General] and I know that as I worked with you for three years.
>
> Hopefully, that makes you feel better and I won't e-mail anymore as I may upset my employer.[29]

Later that day, Nolin advised Paul Rocheford, Concord General's vice president of underwriting, about Duhy "having contacted Marc Berube of [Eaton & Berube] following complaints agents had made about her in November 2005."[30]

---

[29] (Def.'s Mot. for Summ. J., Ex. L).

[30] (Rocheford Aff. ¶2).

Troubled by Duhy's repeated contacts with Eaton & Berube, Rocheford met with Duhy the next day.[31]  Rocheford recalls that Duhy "kept insisting that the memorandum that [McLean] had written in January 2006 was a 'personal attack' on her and that [McLean] had lied to her."[32]  Later that afternoon, Duhy e-mailed a co-worker to relay the contents of her meeting with Rocheford:

> Paul Rocheford called me into his office and he is extremely disappointed with me because I talked with Marc Berube regarding the statements [McLean] made against me . . . he thinks I am over reacting to my write up, over reacting to having them call me while I was on vacation to review my work performance, and he is sure that I miss [sic] understood [McLean] . . . and he isn't sure if we will be able to go forward. . . . .  I guess I had no right to defend myself.[33]

Following his meeting with Duhy, and after further investigation, Rocheford made the decision to terminate Duhy.  His affidavit, submitted by Concord General in support of its summary judgment motion, specified four reasons:

- "inappropriate and disruptive behavior,"

- "inappropriate contacts with employees of [Eaton & Berube] about complaints first made about her in November 2005,"

---

[31] (Id.).

[32] (Rocheford Aff. ¶3).

[33] (Def.'s Mot. for Summ. J., Ex. N).

13

- misinterpretation of comments made by McLean, and

- "overreact[ion] to . . . a reasonable response to the complaints that had been made about her by a number of agents."[34]

According to Rocheford, his decision to terminate Duhy "had nothing to do with any medical problem she may have had or thought she had, any disability or perceived disability, or any absence from work."**[35]**

## III. <u>ANALYSIS</u>

In employment discrimination cases where there is no direct evidence of discrimination, whether brought under the FMLA or ADA, courts apply the burden shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[36]  <u>See</u> <u>Hodgens v. Gen. Dynamics Corp.</u>, 144 F.3d 151, 160 (1st Cir. 1998) (FMLA claims); <u>Patten</u>, 300 F.3d at 24-25 (ADA claims).  Under that framework, the plaintiff must first establish a prima facie

---

[34](Rocheford Aff. ¶4).

[35](Rocheford Aff. ¶5).

[36]Duhy argues that the <u>McDonnell-Douglas</u> burden shifting analysis is inapplicable to this case, and a "mixed-motive" analysis applies, because she has presented the court with direct evidence of employment discrimination.  <u>See</u> <u>Patten v. Wal-Mart Stores E., Inc.</u>, 300 F.3d 21, 24 (1st Cir. 2002).  Based on the court's review of the record, there is none.

case of discrimination.  See Thompson v. Coca-Cola Co., 522 F.3d 168, 176 (1st Cir. 2008).

Establishing a prima facie case "creates a presumption of discrimination, shifting the burden to the employer to articulate a legitimate, non-discriminatory reason" for the adverse employment action.  Billings v. Town of Grafton, 515 F.3d 39, 55 (1st Cir. 2008); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) (noting that the employer's "burden is one of production, not persuasion; it can involve no credibility assessment").  If the employer creates a genuine issue of material fact, the presumption of discrimination "drops from the case" and the burden shifts back to the plaintiff to "show that the employer's stated reason for [the challenged action] was in fact a pretext" for discrimination.  Billings, 515 F.3d at 55. "After plaintiff and defendant bear their preliminary burdens, plaintiff bears the ultimate burden of proving that the alleged discriminatory action was the determining factor in an adverse employment action."  Patten, 300 F.3d at 24-25.

## A.  **FMLA retaliation**

"The FMLA contains two distinct types of provisions:  those establishing substantive rights and those providing protection for the exercise of those rights."  Colburn v. Parker

15

Hannifin/Nichols Portland Div., 429 F.3d 325, 330 (1st Cir.
2005).  Chief among the substantive rights granted by the FMLA is
the right for an eligible employee to take up to twelve weeks of
unpaid medical leave each year due to a serious health condition
that renders the employee unable to perform the functions of her
position.  See 29 U.S.C. § 2612(a)(1)(D).[37]  In order to protect
the exercise of that right, the FMLA makes it unlawful for an
employer to discriminate or retaliate against an employee who
takes, or attempts to take, medical leave protected by the
statute.  See id. § 2615(a)(1)-(2); Hodgens, 144 F.3d at 161.
Duhy alleges such retaliation, contending that Concord General,
unhappy that she had taken time off to deal with her medical
problems, and fearful that she may take additional leave,
terminated her employment.

    To establish a prima facie case of FMLA retaliation, a
plaintiff must show that (1) she engaged in a "protected action;"
(2) she "suffered an adverse employment action;" and (3) "there
was some possibility of a causal connection between the
employee's protected activity and the employer's adverse
employment action, in that the two were not wholly unrelated."

---

    [37]Protected medical leave need not be taken all at once, but
may be taken intermittently "when medically necessary."  Hodgens,
144 F.3d at 159 (quoting 29 U.S.C. § 2612(b); 29 C.F.R. §
825.117).

Colburn, 429 F.3d at 336 n.10.  Here, Duhy's prima facie case

never gets out of the starting blocks; she never took "protected

action" as that term is used under the FMLA.

In order for an employee's time off to be protected by the

FMLA, the employee's leave must fall into one of four enumerated

categories:  (a) childbirth; (b) foster care placement or

adoption; (c) caring for immediate family with a serious health

condition; or (d) the employee's serious health condition.  See

29 U.S.C. § 2612(a)(1).  Duhy brings her claim under the fourth

category; she contends that she suffered from a serious health

condition rendering her unable to perform the functions of her

position as an underwriter.  But an employee requesting FMLA

leave due to a serious health condition must in fact suffer from

such a condition.  See id. § 2612(a)(1)(D).  Such an employee's

inability to present evidence that her medical problem

constitutes a serious health condition renders the resulting

leave unprotected under the FMLA, and is fatal to the required

prima facie showing.  See Greenwald v. Tambrands, Inc., 366 F.

Supp. 2d 195, 203 (D. Me. 2005) (noting that a prima facie case

of FMLA retaliation fails where the plaintiff did not suffer from

a serious health condition).

Without expounding on what it means to suffer from a serious

health condition, it suffices to say that Duhy did not.  First,

17

and most important, Duhy fails to present any evidence that either her leg pain or shingles virus amounted to a serious health condition entitling her to FMLA leave. See 29 U.S.C. § 2611(11) (defining "serious health condition"). Specifically, there is no evidence before the court that her health problems involved "inpatient care" or "continuing treatment by a health care provider," which, at the FMLA's broadest level of generality, are the standards used to determine whether an "illness, injury, impairment, or physical or mental condition" amounts to a serious health condition. See id. §§ 2611(11)(A) and (B).

Further, Duhy presents no authority for the proposition she asks the court to adopt:  that a plaintiff who is not entitled to FMLA leave may nonetheless maintain an FMLA retaliation claim based on her attempts to seek FMLA protection. Contra Greenwald, 366 F. Supp. 2d at 203; Schmittou v. Wal-Mart Stores, Inc., No. Civ. 011763, 2003 WL 22075763, at *7 (D. Minn. Aug. 22, 2003) (plaintiff "was not eligible for leave under the FMLA, so it was impossible for her to engage in any activity protected by the statute"); Rogers v. Bell Helicopter Textron, Inc., No. 99-CV-988-R, 2000 WL 1175647, at *3 (N.D. Tex. Aug. 17, 2000) (same).

Second, Duhy's own health care provider concluded that Duhy's medical issues did not amount to a serious health

condition.  As is permitted under the FMLA, Concord General required that Duhy's request for leave "be supported by a certification issued by [her] health care provider."  29 U.S.C. § 2613(a).  Concord General informed Duhy of this requirement when it provided her with FMLA paperwork on January 11, 2006, and in its employee handbook.[38]  The nurse practitioner chosen by Duhy to perform this assessment, who was uniquely qualified to address her medical issues, concluded that Duhy's situation was "not a serious health condition."[39]

Finally, Duhy cannot bootstrap her prima facie case by arguing that, due to her delayed disclosure that she did not suffer from multiple sclerosis or Parkinson's Disease, Concord General "regarded" her as suffering from a serious health condition.  Even assuming that Concord General erroneously regarded her as suffering from a serious health condition--a proposition for which there is no evidence--the FMLA, unlike the ADA, does not provide for claims based on an employer's mistaken

---

[38](See Def.'s Mot. for Summ. J., Ex. O, p. 24).  Concord General's employee handbook notifies employees that "[w]hen the leave is due to a serious health condition, a physician's or practitioner's written statement or certification concerning the serious health condition . . . will be required prior to commencement of the leave, or in cases or emergency, within 15 days after the commencement of the leave."

[39](See Def.'s Mot. for Summ. J., Ex. E, p. 5).

perception of its employee's health.  Compare 29 U.S.C. § 2601 et seq., with 42 U.S.C. § 12102(3) (recognizing ADA claim where plaintiff is "regarded as" disabled), and infra Part III.B.  Duhy provides no authority to the contrary.  Furthermore, recognizing a "regarded as" claim here would allow Duhy to benefit from her failure to disclose to Concord General that, despite what she had initially told it, the pain in her calf was not attributable to multiple sclerosis or Parkinson's disease; indeed, her neurologist had ruled out both of these serious conditions by the middle of December 2005.

Because she did not suffer from a "serious health condition" as required and defined by the FMLA, her leave to address her temporary, short-lived health issues did not constitute "protected action."  Colburn, 429 F.3d at 336 n.10.  This is fatal to her required prima facie showing.  Summary judgement is therefore granted to Concord General on Duhy's claim of FMLA retaliation.

**B. ADA disability discrimination**

The ADA provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability . . . ."  42 U.S.C. § 12112(a); see also RSA § 354-A:7 (using similar language).  Duhy's claim--

clarified at oral argument--is not that Concord General discriminated against her on the basis of an actual disability, but rather that Concord General mistakenly "regarded" her as disabled, and terminated her employment on the basis of that erroneous belief.  Specifically, Duhy argues that she had an actual, nonlimiting impairment (i.e., the shingles virus) that Concord General mistakenly believed impaired her ability to work as an underwriter.  See Sullivan v. Neiman Marcus Group, Inc., 358 F.3d 110, 117 (1st Cir. 2004); infra Part III(B)(1).

**1. Prima facie case**

In order to establish a prima facie case of ADA employment discrimination, a plaintiff must show:  "(1) that she was 'disabled' within the meaning of the ADA; (2) that she was able to perform the essential functions of her job with or without accommodation; and (3) that she was discharged or adversely affected, in whole or in part, because of her disability."  Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 82 (1st Cir. 2008). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."

21

42 U.S.C. § 12102(2).[40]  In order to show that Concord General regarded her as disabled, Duhy must either show that (1) though she was not impaired at all, Concord General mistakenly believed that she had an impairment that substantially limited a major life activity; or (2) she had an actual, nonlimiting impairment that Concord General mistakenly believed was substantially limiting.  See Sullivan, 358 F.3d at 117.  Duhy explained at oral argument that her claim is the latter type--that Concord General mistakenly believed that her actual ailment (shingles) substantially limited her ability to work.

Unfortunately for Duhy, there is no evidence that anyone at Concord General ever regarded her as disabled within the meaning of the ADA.  As she conceded at oral argument, the only evidence in the record on this point is the plan of action issued to her

---

[40]Although the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), changed the evaluation of ADA claims and the definition of the term "disability" under the ADA, its provisions, by their own terms, did not become effective until January 1, 2009.  When a case implicates a federal statute enacted after the events in a suit, that statute will not be construed to have a retroactive effect absent clear congressional intent.  See Landgraf v. USI Film Prods., 511 U.S. 244, 245 (1994) (declining to retroactively apply the 1991 amendments to Title VII case).  Accordingly, this court applies the ADA as it existed when the complained-of acts occurred.  See, e.g., E.E.O.C. v. Agro Distrib., LLC, 555 F.3d 462, 469 n.8 (5th Cir. 2009); Kiesewetter v. Caterpillar, Inc., 295 Fed. Appx. 850, 851 (7th Cir. 2008); Fournier v. Payco Foods Corp., No. 07-1667, 2009 WL 1164540, at *5 n.9 (D.P.R. May 1, 2009).

in February 2006.  But this evidence fails to address what, if any, mistaken perceptions Concord General entertained about the limiting effect the shingles virus had on her ability to work. Rather, the plan of action demonstrates, at most, that Concord General was aware Duhy was under stress--which she attributed to her ongoing health concerns, overwhelming workload, and lengthy commute--and that Duhy (not Concord General) believed that this stress (and not the shingles) impaired her ability to make efficient decisions at work.  The record is bereft of evidence, circumstantial or otherwise, demonstrating that Concord General mistakenly attributed her poor work performance to the shingles virus.

Further, Duhy fails to make the "weighty showing" required to establish an ADA claim where the claimed major life activity is the plaintiff's ability to work.  See Bailey v. Ga.-Pac. Corp., 306 F.3d 1162, 1168 (1st Cir. 2002).

> When working is the major life activity at
> issue, a plaintiff must demonstrate not only
> that the employer thought that [s]he was
> impaired in [her] ability to do the job that
> [s]he held, but also that the employer
> regarded [her] as substantially impaired in
> either a class of jobs or a broad range of
> jobs in various classes as compared with the
> average person having comparable training,
> skills and abilities.

<u>Ruiz Rivera</u>, 521 F.3d at 83 (internal quotation marks omitted).
"This demonstration generally requires the introduction of
evidence on the accessible geographic area, the numbers and types
of jobs in the area foreclosed due to the impairment, and the
types of training, skills, and abilities required by the jobs."
<u>Sullivan</u>, 358 F.3d at 116 (internal quotation marks omitted).
Here, Duhy fails to raise a genuine issue of material fact that
Concord General regarded her as unable to perform a class of jobs
or a broad range of jobs in various classes; indeed, she fails to
even mention the "broad range of jobs" requirement other than the
cursory and wholly unsupported allegation that Concord General
believed that the shingles virus "precludes [her] from a broad
range of jobs."[41]  "[C]onclusory allegations, improbable
inferences, and unsupported speculation," are insufficient to
defeat a properly supported motion for summary judgment.  <u>See</u>
<u>Benoit v. Tech. Mfg. Corp.</u>, 331 F.3d 166, 173 (1st Cir. 2003).


## 2. **Pretext**

Even assuming <u>arguendo</u> that Duhy was able to establish a
prima facie case, she fails to show that Concord General's
proffered justification for her termination--which she conceded

---

[41](Pl.'s Opp'n to Def.'s Mot. for Summ. J. 22).

at oral argument sustained the employer's burden under the
McDonnell-Douglas framework--was pretextual.  See Reeves, 530
U.S. at 147 (evidence of pretext is such that a "trier of fact
can reasonably infer from the falsity of the explanation that the
employer is dissembling to cover up a discriminatory purpose").
"In assessing pretext, the court must look at the total package
of proof offered by the plaintiff."  Tobin, 433 F.3d at 105.

     Duhy's proof "has to clear two significant hurdles before
[s]he is able to show pretext."  Id.  First, she must refute
Concord General's evidence showing that it was her inappropriate
contacts with clients, and not disability, that constituted the
real reason for her termination.  See id.  Second, she must
present evidence of her own showing that Concord General's
"asserted reason was a pretext hiding discrimination."  Id.  Duhy
fails to clear either of these hurdles.

     Concord General provides a well-documented account of Duhy's
repeated communications with several of the agencies that
complained about her performance.  This evidence shows that:

          (1) some of Concord General's clients viewed Duhy
     as slow to respond to their inquiries;

          (2) these clients complained to Concord General
     about her performance;

          (3) Duhy contacted several of these clients to contest
     their complaints in ways that were, in their best light,

25

distracting, and in their worst light, annoying, off-putting, and even insulting; and

(4) after becoming aware that at least some of her superiors at Concord General would be upset if she continued to contact unhappy clients, she contacted Eaton & Berube about its complaints anyway.

Duhy has done nothing to refute this evidence.

Nor does Duhy produce affirmative evidence to establish that Concord General's stated reason for terminating her employment was merely a pretext to disguise discrimination.  Instead, she argues that the temporal proximity between her time off from work and her termination give rise to an inference of pretext.  While protected conduct closely followed by adverse action may justify an inference of retaliatory motive, temporal proximity standing alone is not enough to establish pretext.  See Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) ("chronological proximity does not by itself establish causality, particularly if the larger picture undercuts any claim of causation").  Duhy fails to submit any credible evidence to augment her pretext argument.

As opposed to establishing pretext, the evidence shows that, prior to the events precipitating her termination (i.e., her repeated contacts with insurance agencies that complained about her performance), Concord General regarded Duhy as capable of continuing to work as a personal lines underwriter; took steps to help her address the problems she was having with clients;

replaced her as the underwriter for Eaton & Berube, the agency
that complained the most about her responsiveness; observed her
performance gradually improve; and remained optimistic "that if
[Duhy] applies herself she can bring her performance issues back
up to the appropriate expectation levels."  No discernable
evidence in the record demonstrates that Duhy's termination was
for any reason other than her inappropriate contacts with Concord
General's clients and the performance deficiencies giving rise to
those contacts.  This lack of evidence of pretext, coupled with
her failure to establish a prima facie case, entitles Concord
General to summary judgment on Duhy's ADA discrimination claim.

## C. **Wrongful discharge**

Under New Hampshire law, a plaintiff alleging wrongful
discharge must establish that (1) her employer was motivated by
bad faith, retaliation or malice; and (2) she was terminated
because she performed acts that public policy would encourage or
refused to perform acts that public policy would condemn.  See
Lacasse v. Spaulding Youth Ctr., 154 N.H. 246, 248 (2006).  "The
first prong focuses on the nature of the employer's actions,
while the public policy prong pertains to the employee's acts."
Antonis v. Electronics for Imaging, Inc., No. 07-cv-163-JL, 2008

WL 5083979, at *3 (D.N.H. Nov. 25, 2008) (citing <u>Porter v. City
of Manchester</u>, 151 N.H. 30, 39 (2004)).

Duhy contends that Concord General wrongfully terminated her
employment in retaliation for her "obtaining medical treatment,
taking time off for illness, and allowed use of vacation, sick
and other time, as well as processing her medical bills through
health insurance provided by the employer . . . ."[42]  Concord
General responds with the following three arguments:  (1) Duhy's
common law claim is superseded by the FMLA; (2) that, as a
general proposition, there is no public policy protecting the
conduct for which Duhy claims she was terminated; and (3) even if
there were such a public policy, there is no evidence that Duhy
was fired for engaging in conduct involving that public policy.

Concord General first argues that Duhy's wrongful discharge
claim is superseded by the FMLA because that statute was intended
to provide a cause of action to employees retaliated against for
taking protected medical leave.  <u>See</u> <u>Murdy v. Nashua School
Dist.</u>, No. 05-cv-175-PB, 2006 WL 3730092, at *3 (D.N.H. Dec. 19,
2006) (noting that "a plaintiff may not pursue a common law
remedy where the legislature intended to replace it with a
statutory cause of action").  While an accurate statement of the

---

[42](Compl. ¶49).

law, this argument fails to carry the day for Concord General
because Duhy's wrongful discharge claim extends beyond the
protections afforded by the FMLA.  In addition to arguing that
Concord General terminated her for taking FMLA leave, Duhy
alleges that she was fired for taking vacation time and
processing medical bills through her employer's health insurance
policy.  Thus, only so much of Duhy's complaint that alleges she
was terminated for taking protected medical leave is superseded
by the FMLA.  See id.

The remainder of Duhy's wrongful discharge claim ultimately
founders because she fails to persuade the court that New
Hampshire law recognizes the public policies she has suggested.
"Although ordinarily, the issue of whether a public policy exists
is a question for the jury, at times the presence or absence of
such a public policy is so clear that a court may rule on its
existence as a matter of law and take the question away from the
jury."  Short v. School Admin. Unit No. 16, 136 N.H. 76, 84
(1992) (internal citation omitted).  This is such a time.  Duhy
presents no authority--under New Hampshire law or elsewhere--or
convincing argument supporting her claim that, as a broad
proposition, public policy encourages employees to take vacation
days or file health insurance claims through the policy offered
by their employer.  While there undoubtedly are specific

circumstances where public policy could encourage employees to engage in the activities offered by Duhy (e.g., obtaining medical treatment to address a highly contagious virus), there are myriad scenarios where public policy would not (e.g., malingering, taking excessive vacation, filing bogus insurance claims).  Based on a review of all the evidence in this case, viewed in the light most favorable to Duhy, the court cannot conclude, and New Hampshire law has not held, that there is a public policy encouraging employees to engage in the sort of conduct for which Duhy alleges she was fired.

But even if the court were to assume, without deciding, that there were public policies encouraging an employee to take vacation and file insurance claims, there is no evidence that Duhy was terminated for engaging in any conduct encouraged by those policies.  Rather, as already discussed at length, the evidence instead shows that Concord General terminated Duhy's employment for inappropriate contacts with clients and a general lack of responsiveness to their inquiries.  See Part III.B.2.

Because Duhy has failed to persuade the court that New Hampshire law recognizes the public policies she has suggested, or that there is any evidence to support an inference that she was terminated for public policy-encouraged conduct, the court finds that she has failed to establish her prima facie case.

30

Concord General, therefore, is entitled to summary judgment on Duhy's wrongful discharge claim.

IV.   **CONCLUSION**

For the foregoing reasons, Concord General's motion for summary judgment[43] is GRANTED in its entirety.  The clerk is ordered to enter judgment accordingly and close the case.


   **SO ORDERED.**


_____
Joseph N. Laplante
United States District Judge


Dated:    June 10, 2009


cc:  Leslie H. Johnson, Esq.
     William D. Pandolph, Esq.

_____

[43]Document no. 10.

31